**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 11-095** |
| **v.** | * | **SECTION: "R"** |
| **NOE JUAREZ** | * | |
| | * * * | |

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE EXTRINSIC ACTS**
**PURSUANT TO RULE 404(b) OF THE FEDERAL RULES OF EVIDENCE**

**NOW INTO COURT COMES** the United States of America, appearing herein through

the undersigned Assistant United States Attorney, and moves this Honorable Court to allow the

introduction of certain relevant extrinsic evidence at trial because this evidence is highly

probative evidence of the defendant Noe Juarez's intent, plan, lack of mistake, opportunity, and

motive as charged in Counts 1 and 2 of the superseding indictment.

**I.     THE FACTS**

**Procedural History**

On April 21, 2011, co-defendants Efrain Grimaldo, Sergio Grimaldo and Sabino Duarte

were together indicted in a single count indictment charging a conspiracy to distribute five (5)

kilograms or more of cocaine hydrochloride with each other and others known and unknown to

the grand jury.  On January 25, 2012, defendant Sabino Duarte entered a plea of guilty to  the

indictment as charged without the benefit of a plea agreement.  Sabino Duarte is pending

sentencing and is cooperating in the prosecution of this case.

On February 24, 2014, defendant Efrain Grimaldo proceeded to a contested jury trial on

the indictment and was convicted as charged. On September 2, 2014, Efrain Grimaldo was

sentenced to a term of imprisonment of 405 months based on the Court's finding that Efrain Grimaldo was responsible for the distribution of 1,640 kilograms of cocaine hydrochloride during the course of the charged conspiracy.

On June 24, 2014, defendant Sergio Grimaldo was extradited from Mexico on the indictment following his arrest by Mexican authorities, based on an extradition request from the United States. Sergio Grimaldo made his initial appearance in Federal Court in the Eastern District of Louisiana on the indictment on June 25, 2014.

A superseding indictment was then returned by the grand jury against Sergio Grimaldo and Noe Juarez on April 2, 2015, charging Sergio Grimaldo and Noe Juarez in Count 1 with a conspiracy to distribute five (5) kilograms or more of cocaine hydrochloride.  In Count 2 Noe Juarez was charged with a separate conspiracy to conspire to possess firearms in furtherance of a drug trafficking crime. Count 1 of the superseding indictment expanded the dates of the conspiracy compared with Count 1 of the original indictment and added Count 2 as a new charge against Noe Juarez only.

On September 23, 2015, Sergio Grimaldo entered a plea of guilty to the single count in the original indictment (not the superseding indictment) without the benefit of a plea agreement. The Government stated on the record at Sergio Grimaldo's plea hearing that it agreed to dismiss the superseding indictment against Sergio Grimaldo at the time of his sentencing. Sergio Grimaldo is pending sentencing and is cooperating with the United States in the prosecution of this case.

Noe Juarez was arrested on the superseding indictment in Houston, Texas on April 7, 2015.  He made his initial appearance on the superseding indictment in the Southern District of Texas on April 8, 2015, and an extensive detention hearing was held in the Southern District of

2

Texas on April 13, 2015. The Honorable Magistrate Judge Francis Stacy ordered that the defendant, Noe Juarez, be released on bond, and the United States immediately moved to appeal this bond determination with Chief District Court Judge Sarah Vance, the District Court Judge assigned the case of *US v. Noe Juarez*, 11-095 "R."  On April 14, 2015, Judge Vance issued a stay on the bond determination issued in the Southern District of Texas, and ordered that a detention hearing take place before her in the Eastern District of Louisiana. The detention hearing took place before Judge Vance on April 23, 2015, and Judge Vance determined that Noe Juarez would be detained without bond on the two charges contained in the superseding indictment.

On October 2, 2015, the Government provided, upon defense request, a Bill of Particulars to aid the defense in understanding the basic evidence of the two charged conspiracies in the superseding indictment. The Government provided an essential summary of the most significant intrinsic evidence and overt acts by the defendant, Noe Juarez, to aid the defense in its understanding of the two charged conspiracies.  The Government noted in its filing of the Bill of Particulars that the summary of the evidence was only a summary.  It was not a complete list of all the evidence and overt acts, and it was not a complete list of all the witnesses and evidence the Government intended to offer during its case-in-chief. The Government noted in the Bill of Particulars that it would separately provide notice of Rule 404(b) evidence that the Government would seek to introduce in the trial of Noe Juarez, in accord with the Court's Order. This filing now complies with that Rule 404(b) notice as ordered.

### Case-in-Chief Evidence

Before outlining the Rule 404(b) probative extrinsic evidence the Government briefly outlines the intrinsic evidence (case-in chief evidence) for Counts 1 and 2 in order to show later

in this Notice that the intrinsic and extrinsic evidence are nearly identical and therefore highly probative to establish the plan, design, intent, motive, lack of mistake and opportunity of Noe Juarez in relation to Counts 1 and 2 in the superseding indictment.

The intrinsic evidence that the Government will offer during its case-in-chief will show that in Counts 1 and 2 that two conspiracies existed to (1) distribute five (5) kilograms or more of cocaine hydrochloride by the charged defendants, that is, Efrain Grimaldo, Sergio Grimaldo, Sabino Duarte and Noe Juarez, and others known and unknown, and (2) that Noe Juarez and others known and unknown conspired to possess firearms in furtherance of a drug trafficking crime. In both charged conspiracies those  known "others" include but are not limited to co-conspirators Aldo Perez Marquez, "Tio" (true name unknown), John Wesley, David Garza, Veronica Garza, Edward Lester Talley, Reynaldo Bello, and others known and unknown.

The structure of the charged conspiracy in count one (1) of the superseding indictment includes Efrain Grimaldo and Sergio Grimaldo  arranging to receive and receiving large shipments of cocaine hydrochloride from drug sources in Mexico, to include drug supplies from members of the Los Zetas Mexican drug cartel. The Grimaldo brothers, working together and at times independently, kept the cocaine shipments in various "safe houses" in Houston, and provided these drugs to conspirators Aldo Perez Marquez, Sabino Duarte, and "Tio," who in turn would distribute the drugs to conspirator Edward Lester Talley and others in Houma, Louisiana, for further distribution to cocaine addicts for a profit in the Houma, Louisiana area. In total, Aldo Perez Marquez, Sabino Duarte, and "Tio" transported approximately one-hundred (100) kilograms of cocaine hydrochloride to Edward Lester Talley and others in Houma, Louisiana during the approximate years of 2009 to 2010, in a hidden compartment of a Nissan Titan.

As part of Count 1, Efrain and Sergio Grimaldo also provided large quantities of cocaine hydrochloride to conspirator John Wesley, who in turn employed drivers who transported large shipments of cocaine hydrochloride to various cities in the United States to include, at least, Jackson Mississippi, Pensacola, Florida, Houston, Texas, Memphis, Tennessee, Detroit, Michigan and, on one occasion, Houma, Louisiana. Between the years 2006 and 2009, John Wesley transported approximately five-hundred (500) kilograms of cocaine hydrochloride for the Grimaldos to sub-distributors in the cities listed above and elsewhere.

As part of Count 1, conspirator David Garza supplied the Grimaldo brothers with cocaine hydrochloride and also received cocaine hydrochloride from the Grimaldo brothers, and this cocaine was distributed by David Garza, Veronica Garza and others in Houston, Texas and Houma, Louisiana.  Between the years 2006 and 2010, David Garza and other conspirators distributed approximately one-hundred (100) kilogram of cocaine hydrochloride during the conspiracy charged in Count 1.

Finally, as part of the conspiracy charged in Court 1, Efrain Grimaldo and Sergio Grimaldo arranged to transport approximately three-hundred (300) kilograms of cocaine hydrochloride to co-conspirator Reynaldo Bello, who distributed cocaine in the New York City area. The Grimaldos shipped at least fifteen (15) separate shipments of cocaine hydrochloride from Houston to New York City by truck for Reynaldo Bello. Bello distributed cocaine hydrochloride provided by the Grimaldo brothers to sub-distributors in the New York City area. In April 2008, one shipment consisting of approximately thirty (30) kilograms of cocaine hydrochloride that the Grimaldo brothers attempted to ship to New York was seized by law enforcement officers in Baltimore, Maryland.

The structure of Count 2 of the superseding indictment includes Noe Juarez and others known and unknown possessing firearms in furtherance of a drug crime.  Those known others include Sergio Grimaldo, Efrain Grimaldo, Sabino Duarte and Aldo Perez Marquez.  Noe Juarez also offered for sale firearms to Aldo Perez Marquez during the course of the charged conspiracy in Count 2. The firearms provided by Noe Juarez were kept in a Houston "safe house" and were available to Sergio Grimaldo, Efrain Grimaldo, Sabino Duarte, Aldo Perez Marquez and other conspirators for physical protection of the drugs and drug financial proceeds kept at the "safe house" during the course of Counts 1 and 2.  Aldo Perez Marquez has stated that he was ready to use these firearms in the "safe house" if an intruder entered the "safe house." One other assault rifle firearm was kept at the residence of Sergio Grimaldo by Sergio Grimaldo for his protection during the course of conduct by the conspirators in Counts 1 and 2.

A large amount of cocaine hydrochloride that was distributed to Houma, Louisiana was kept at the Houston "safe house" along with the financial proceeds from the sale of cocaine in Houma, Louisiana. Necessary drug packaging materials for the cocaine, money counting machines, and packaging material for the cash drug proceeds were also kept at the Houston "safe house." Noe Juarez understood that the firearms he provided to the conspirators were available to the conspirators to protect themselves during the course of conduct by the conspirators as charged in Counts 1 and 2.

Defendant Noe Juarez joined the conspiracies in Counts 1 and 2 by providing vital material support to the two charged conspiracies by undertaking the following overt acts that knowingly furthered the object of both conspiracies:

(1) Providing an assault rifle to conspirator Sergio Grimaldo for his protection while knowing that Sergio Grimaldo was a cocaine distributor. Sergio Grimaldo kept this

firearm at Sergio Grimaldo's residence along with cocaine hydrochloride and the proceeds from the sale of cocaine hydrochloride as charged in Count 1.

(2) Providing at least two (2) firearms to conspirator Sabino Duarte for Efrain Grimaldo, that is, an AK-47 assault rifle and a semi-automatic pistol, while knowing that Sabino Duarte was a conspirator in the Grimaldo cocaine distribution conspiracy as charged in Counts 1 and 2. Sabino Duarte kept these firearms at a drug "safe house" in Houston for protection for the conspirators. In this "safe house" cocaine hydrochloride and the proceeds from the conspirators' sale of cocaine hydrochloride was kept and stored in hidden areas of the house.

(3) Providing Efrain Grimaldo and Sergio Grimaldo with two (2) police-style bullet-proof vests for the physical protection of the conspirators.

(4) Offering to provide two (2) firearms to conspirator Aldo Perez Marquez for his protection in illegal drug transactions but Aldo Perez Marquez declined to purchase these firearms from Noe Juarez. Aldo Perez Marquez was prepared to use these firearms kept at the "safe house" for the conspirators' protection during the course of the conspiracies charged in Counts 1 and 2.

(5) Providing at least three (3) vehicles for the use of conspirators Sergio Grimaldo, Efrain Grimaldo, John Wesley, David Garza and other conspirators. The conspirators used these vehicles to travel to meet with members of the two charged conspiracies to discuss cocaine distribution plans and arrange to distribute cocaine hydrochloride and transport firearms to "safe houses" and other locations for protection.  These three (3) vehicles were purchased, financed, insured, and registered by Noe Juarez and in the name of "Noe Juarez" for the use of the conspirators. Noe Juarez personally paid the

vehicle financing loans with proceeds from Count 1 that included proceeds from the conspirators' cocaine distribution in Houma, Louisiana and other cities. At least two (2) other vehicles not purchased by Noe Juarez were also used by the Grimaldo brothers and their conspirators.  These two other vehicles were insured by Noe Juarez. Please see Attachment "A" for a listing of the vehicles furnished by Noe Juarez to the conspirators to further the conspiracies charged in Counts 1 and 2. The expedited payments of the car loans by Noe Juarez using the proceeds from Count 1 are also listed in Attachment "A."

(6) Providing the conspirators with police scanner radios to assist the conspirators in evading law enforcement detection during the course of Counts 1 and 2.

(7) Obtaining law enforcement sensitive information from "restricted-use" and "password protected" Houston Police computer data bases for the conspirators to assist in concealing and protecting the conspirators' actions in Counts 1 and 2. Accessing these Houston Police databases for non-law enforcement purposes is a violation of Houston Police Department policy pursuant to Attachment "B."

(8) Informing the conspirators of highly specific law enforcement surveillance techniques and methods in order to aid the conspirators to evade law enforcement detection during the course of the conspiracies charged in Counts 1 and 2.

(9) Providing a 2007 Cadillac Escalade that was purchased, financed, registered, and insured by Noe Juarez to Sergio Grimaldo, who in turn provided it to co-conspirator Reynaldo Bello in New York. Noe Juarez then filed a false police report with the Houston Police Department when the 2007 Cadillac Escalade was seized by law enforcement in New York City.  Noe Juarez personally flew to New York City to

retrieve the vehicle and drive it back to Houston, Texas to return it to the Grimaldo
brothers.

(10)     Noe Juarez received money from the conspirators for his overt acts described
above, knowing that this money was the financial proceeds from the distribution of
illegal drugs as charged in count 1.

(11)     Noe Juarez has been audio recorded in undercover DEA operations agreeing to
access Houston Police Department police data for Aldo Perez Marquez and actually
accessing the requested data for Aldo Perez Marquez and attempting to release Efrain
Grimaldo from arrest by another officer by vouching for him as a "good guy" who
has never been a "problem."

Attachment "C" is a graphic depiction of Counts 1 and 2, as described and discussed
above, and the specific role Noe Juarez played as a conspirator in these two charged
conspiracies.

## Rule 404(b) Evidence

The overt acts of Noe Juarez described below in the proposed Rule 404(b) evidence is
similar to Counts 1 and 2 of the charged conspiracies where Noe Juarez provided virtually the
same type of assistance to: (1) a separate Houston based cocaine hydrochloride conspiracy
headed by Isaias Gallegos "Mickey," and (2) in another separate Houston based conspiracy to
possess firearms in furtherance of a drug crime with Rodolfo Martez Castaneda "Rudy." The
overt acts in the extrinsic conspiracy involving  Noe Juarez and  Rodolfo Martez Castaneda
"Rudy"  were audio and video recorded by an FBI confidential informant. This is the only
evidence available in this case that video-records Noe Juarez in overt acts to possess firearms in
furtherance of a drug trafficking crime.

### The Noe Juarez – Isaias Gallegos Conspiracy

Attachment "D" is a graphic representation of the first of these two (2) separate, extrinsic conspiracies offered as Rule 404(b) evidence and the role that Noe Juarez played in knowingly furthering this separate conspiracy. This first of two separate conspiracies will be referred to as the "Gallegos conspiracy." Although the Mexican drug suppliers in the "Gallegos conspiracy" are the same as that in Count 1, and although Sergio Grimaldo is a common member of both the charged conspiracy in Count 1, and the "Gallegos conspiracy," discussed below, the Government nevertheless believes that the two conspiracies are best viewed as separate conspiracies since they operated independently of each other. In the "Gallegos conspiracy," the leader of this conspiracy, Isaias Gallegos "Mickey," arranged to receive and did receive large shipments of cocaine hydrochloride from cartel connected Mexican sources of supply. Gallegos used a series of co-conspirators to distribute cocaine throughout Houston to include, Alvaro Palma, Sulyka Gallegos (wife of Isaias Gallegos "Mickey")  and those known by nicknames to include "Budda," "Nino," and "Poncho." Noe Juarez joined the "Gallegos conspiracy" and provided material support to the conspirators to further the object of the conspiracy, that is, the distribution of large quantities of cocaine hydrochloride throughout Houston. Noe Juarez undertook the following overt acts to further the object of the "Gallegos conspiracy":

1. Provided at least seven (7) firearms to Isaias Gallegos "Mickey" and co-conspirator Alvaro Palma to protect the conspirators during the course of their cocaine conspiracy to distribute cocaine hydrochloride in Houston. Three (3) of these seven (7) firearms were seized in a raid of a "Gallegos conspiracy" Houston drug "safe house" that were directly linked to Noe Juarez who sold these three (3) specific firearms to Gallegos and Palma for protection during their cocaine distribution operation. Regarding these

three (3) firearms Noe Juarez provided to the "Gallegos conspiracy," Noe Juarez
obtained these three (3) firearms from a Houston Police Officer who was completely
unaware that the sale of his firearms to Noe Juarez would be used in furtherance of
the "Gallegos conspiracy" or any other illegal activity.

2.  Provided video images of a police surveillance camera ("police poll camera") in
Houston to conspirator Alvaro Palma. Noe Juarez cautioned Alvaro Palma not to
undertake any illegal activity in the vicinity of this police camera because it would be
recorded by law enforcement.

3.  Advising Alvaro Palma to change his residential address periodically to avoid police
detection since Alvaro Palma and other conspirators were involved in the illegal
distribution of drugs.

4.  Laundering small denomination US currency derived from the "Gallegos conspiracy"
at night clubs in Houston by taking US currency in small denomination of ones ($1s),
fives ($5s), and tens ($10s) that were the proceeds of cocaine distribution by the
"Gallegos conspiracy," and receiving US currency denominations of twenty-dollars
($20s) or higher from the Houston night clubs. Noe Juarez serves as a private security
detail officer at several Houston night clubs and had access to the managers of these
clubs, who were eager to receive smaller denomination US currency to provide
change to the customers of these night clubs.  Alvaro Palma and Isaias Gallegos
"Mickey" needed larger US denomination of US currency to avoid carrying large
bundles of drug cash proceeds, and to satisfy the demands of their Mexican drug
suppliers for the "Gallegos conspiracy" to only use higher denomination US currency
to pay for the shipments of cocaine from Mexico.

5. Volunteering to drive Alvaro Palma's Durango vehicle for several days to see if there was any observable police surveillance of Palma's vehicle. While Noe Juarez was driving Palma's Durango vehicle it was stopped and searched by Houston law enforcement officers, and Noe Juarez reported back to Alvaro Palma that Palma's vehicle was "hot" and that indeed law enforcement officials were following Palma's vehicle, and Palma should understand he was under police surveillance. The Government will offer the testimony of the police officer who stopped Noe Juarez in Alvaro Palma's vehicle and was present while the vehicle was searched.

6. Providing the "Gallegos conspiracy" with the use of a 2008 Cadillac Escalade that Noe Juarez purchased, financed, registered, and insured for the "Gallegos conspiracy" to transport cocaine and the proceeds of cocaine sales during the course of the "Gallegos conspiracy." The 2008 Cadillac Escalade that Noe Juarez provided to the "Gallegos conspiracy" was equipped with a hidden "trap door" that could be used to secretly store cocaine and proceeds from cocaine sales.

Although Noe Juarez voluntarily joined the "Gallegos conspiracy" and undertook overt acts to further the conspiracy discussed above, Noe Juarez remained vigilant and highly concerned that he was being monitored in his support to the "Gallegos conspiracy." On one occasion Noe Juarez physically "patted down" Alvaro Palma and asked him whether Palma was "wearing a wire. This fact establishes that Noe Juarez knew he was directly engaged in illegal conduct in support of a drug conspiracy and was concerned about detection.

**The Noe Juarez - Rodolfo Martez Castaneda "Rudy" Conspiracy**

Attachment "E" is a graphic representation of the second of the two separate conspiracies offered as Rule 404(b) evidence and the role that Noe Juarez played in furthering this separate conspiracy. This second of two extrinsic conspiracies will be referred to as the "Castaneda conspiracy."

During the "Castaneda conspiracy" Noe Juarez and Rodolfo Martez Castaneda "Rudy" joined a conspiracy in Houston, Texas to provide at least two (2) firearms to others in connection with a drug trafficking crime for a profit. The conduct of Noe Juarez in the "Castaneda conspiracy" is similar to the conduct of Noe Juarez in Count 2 of the superseding indictment and also the "Gallegos conspiracy" discussed above.

In the "Castaneda conspiracy," Noe Juarez obtained the first of the two (2) firearms to sell during the course of the "Castaneda conspiracy" from a Houston Police Officer, who was again completely unaware that the sale of his firearm to Noe Juarez would be used in furtherance of the "Castaneda conspiracy" or any illegal activity. In fact, Noe Juarez falsely told the Officer that the firearm he purchased from the Officer was destined for family members in Navasota, Texas, when in fact Noe Juarez sold it for profit to a Federal Bureau of Investigation (FBI) confidential source posing as a Mexican drug dealer.  The second firearm to be sold in connection with a drug trafficking crime was obtained from Noe Juarez. Rodolfo Martez Castaneda "Rudy" and Noe Juarez then made contact with an individual in Houston, Texas to sell these two firearms in connection with the "Castaneda conspiracy." As stated above, this individual was a FBI confidential source with the code name of "Red." The true identity of "Red" and her criminal history and history of payments to her by the FBI have been provided by the Government to the defense.

13

Noe Juarez met with "Red" during nine (9) separate occasions in Houston Texas on the following dates: 2/25/2011, 3/1/2011, 3/3/2011, 3/27/2011, 5/6/2011, 6/9/2011, 7/11/2011, 8/5/2011, 3/14/2012. Each of these nine (9) meetings was audio and/or video recorded by the FBI. Noe Juarez was present for each of these meetings and Rodolfo Martez Castaneda "Rudy" was present for two of these meetings on 3/1/2011 and 3/3/2011. All of the discussions recorded on the meetings between "Red," Noe Juarez, and Rodolfo Martez Castaneda "Rudy" were conducted in the Spanish language. The video and audio recordings along with a Spanish – English transcript of each of the nine (9) meetings are attached to this Rule 404(b) Notice as Attachments "F" through "N."

During Noe Juarez's recorded meetings with "Red," Noe Juarez was advised that "Red" was getting firearms "down there," meaning Mexico. Noe Juarez obtained Houston Police computer data that he sold to "Red" on video camera, and described how "Red" could remove the serial numbers from the guns (an illegal act) to make the guns un-traceable.

The entirety of the conduct in the nine (9) meetings is included in the "Castaneda conspiracy" recordings in attachments "F" through "N," but the Government highlights portions of the transcripts of these recordings below to demonstrate the plan and intent of Noe Juarez. The Government has highlighted in these attachments the most relevant 404(b) evidence for the Court's consideration.

**Noe Juarez's Motives Are Revealed in the Rule 404(b) Evidence**

Noe Juarez was highly opportunistic in his joining of multiple illegal drug and gun conspiracies to distribute illegal drugs and possess firearms in furtherance of drug trafficking crimes. Noe Juarez, as a Houston Police Officer, sought out drug dealers to provide them with the "tools of the trade" such as firearms, bullet proof vests, police sensitive data, vehicles,

14

methods of police surveillance, police scanner radios, and money laundering services, and he did so to receive a financial profit from drug dealers. Although there is no evidence that Noe Juarez directly handled illegal drugs in joining these conspiracies, and Noe Juarez often spoke in coded language when dealing with conspirators, he knowingly performed multiple overt acts in furtherance of all of these conspiracies to ensure that the object of the conspiracies was achieved. He furthered the success of drug dealers to carry out their illegal trade and distribute drugs and guns for protection for a profit.

Much of the activity of Noe Juarez, including his contact with FBI confidential source "Red," was carried out while Noe Juarez was wearing the uniform of the Houston Police Department, thereby giving him some cover to appear to be acting in a police role in public while actually advancing the objectives of illegal conspiracies.

Noe Juarez's conduct in Counts 1 and 2, when compared with his similarconduct in the "Gallegos conspiracy" and "Castaneda conspiracy," reveal an obvious plan and design, that is, in the guise of a police officer Noe Juarez engaged in profitable dealings with drug dealers and advanced the conspiracies which he knowingly and voluntarily joined by his actions.  His actions were not a mistake and were not innocent conduct that inadvertently advanced the conspiracies.

On April 7, 2015, Noe Juarez was arrested. He was Mirandized and asked whether he had ever bought vehicles for drug dealers, sold weapons to drug dealers, or provided any sensitive police information to any known drug dealers. He repeatedly denied providing vehicles, weapons, or information to drug dealers. He denied that he had any knowledge that he dealt with drug traffickers or derived any profit from them. Agents confronted him with the guns found at one of Gallegos' houses. He said that he never sold them or made any profit from them but that he gave guns to Alvaro Palma and someone known to him as "Chicago."

The 404(b) conspiracy evidence discussed in the Gallegos conspiracy and Castaneda conspiracy could not be charged in the Eastern District of Louisiana because all of the overt acts in these conspiracies occurred in the Southern District of Texas. This evidence is only admissible under Rule 404(b).

It is highly critical to the Government's presentation in this case that this pattern of action by the defendant be presented to the jury so that the jury may understand the full extent of Noe Juarez's plan and intent regarding the charged offenses. In this case, the proposed Rule 404 (b) evidence offers matches - and matches almost identically with - the charged conduct in Counts 1 and 2. It is highly probative of the defendant's intent, plan, lack of mistake and motive. To exclude this evidence would deprive the jury of hearing highly relevant evidence that shows how Noe Juarez intentionally joined multiple illegal conspiracies - not by mistake or in an innocent manner - but to knowingly and voluntarily undertake illegal overt acts to further the charged conspiracies. The probative value of this Rule 404(b) evidence far outweighs its prejudicial effect.

## II.    LAW AND ARGUMENT

### a.    The Evidence is Admissible under Rule 404(b)

Evidence of conduct that is extrinsic to the charged offenses is admissible for the purposes listed in Federal Rule of Evidence 404(b). "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Nonetheless, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Rule 404(b) "is a rule of inclusion which admits evidence of other acts relevant to a trial issue except where such evidence tends to prove only criminal disposition." *United States v. Shaw*, 701 F.2d 367, 386 (5th Cir. 1983) (internal citations omitted). This rule derives from the Fifth Circuit's observation in *United States v. Beechum*, 582 F.2d 898, 909 (5th Cir. 1978) (*en banc*), *cert. denied*, 440 U.S. 920 (1979), that "i[t] is derogative of the search for truth to allow the defendant to tell his story of innocence without facing him with evidence impeaching that story." Every other federal circuit court has determined Rule 404(b) is a rule of inclusion. *See e.g. United States v. Carty*, 993 F.2d 1005 (1st Cir. 1993); *United States v. Jamal*, 26 F.3d 1267 (3rd Cir. 1994); *United States v. Castillo*, 181 F.3d 1129 (9th Cir. 1999).

### b. The Fifth Circuit's *Beechum* Analysis

The Fifth Circuit in *Beechum* outlined a two-pronged test governing the admissibility of extrinsic offenses, acts, and other wrongs. The principles governing admissibility are the same whether the other crime, wrong, or act occurred before or after the offense charged. *Beechum*, 582 F.2d at 903. Under *Beechum*, the trial court must first conclude that the extrinsic evidence is relevant to an issue other than the defendant's character and then find that the probative value of the extrinsic evidence outweighs the danger of unfair prejudice to the defendant. *Id.* at 911. The Fifth Circuit has cautioned that, "[w]hile some danger of prejudice is always present, exclusion of extrinsic evidence based on its prejudicial effect 'should occur only sparingly.'" *United States v. Leahy*, 82 F.3d 624, 637 (5th Cir. 1996), *quoting United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993), *cert. denied*, 511 U.S. 1149 (1994).

In evaluating relevancy under *Beechum*, the court should consider the elements the Government must prove at trial. According to the Fifth Circuit, "where . . . intent is not normally inferable from the nature of the act charged, and the defendant fails to give enforceable

pre-trial assurances that he intends not to dispute criminal intent, the government's case-in-chief may include such extrinsic evidence as would be admissible if intent were actively contested." *United States v. Webb*, 625 F.2d 709, 710 (5th Cir. 1980).

The Fifth Circuit has held in a variety of cases that a plea of not guilty places the element of intent at issue in trial so as to permit Rule 404(b) evidence illustrative of intent or motive. This is most common in drug trafficking and conspiracy cases. *See, e.g. United States v. Pompa*, 434 F.3d 800, 805 (5th Cir. 2005) (holding that a not guilty plea sufficiently raised the issue of intent as to permit the admission of Rule 404(b) evidence). Other circuits have similarly held that a not guilty plea automatically puts intent at issue. *See United States v. Niece*, 6 F.3d 110 (6th Cir. 1993) (holding that a not guilty plea for transportation of minors for illicit sexual purposes puts intent at issue sufficient to permit 404(b) evidence); *United States v. Van Metre*, 150 F.3d 339 (4th Cir. 1998) (holding that a not guilty plea to kidnapping puts intent at issue sufficient to permit 404(b) evidence). Thus, a not guilty plea from the defendant automatically puts his intent at issue in trial.

As to the second prong of the *Beechum* test, regarding the probative value of the evidence, the relevant question is not merely whether the evidence would be prejudicial. Instead, the Fifth Circuit measures whether any "undue prejudice" caused by the introduction of the evidence would "substantially outweigh" its probative value. *Beechum*, 582 F.2d at 911. Prejudice is assessed by whether the extrinsic offense is "of a heinous nature," and whether such evidence would "incite the jury to irrational decision by its force on human emotion." *Id.* at 917. Finally, the Fifth Circuit has held that a court can typically minimize the danger of undue prejudice by simply issuing a limiting instruction, rather than excluding evidence of other acts. *United States v. Sanders*, 343 F.3d 511, 518 (5th Cir. 2003).

Additionally, no pre-trial hearing is needed for the Court to rule on this matter. In *Huddleston v. United States*, 485 U.S. 681, 687-88 (1988), the Supreme Court held that the district court does not need to find the Government has proved the extrinsic offense by a preponderance of the evidence before it submits evidence of the extrinsic offense to the jury under Rule 404(b).

Furthermore, the Court went on to note that:

> The text . . . [of Rule 404(b)] . . . contains no intimation . . . that **any preliminary showing** is necessary before such evidence may be introduced for a proper purpose . . . The Advisory Committee specifically declined to offer any "mechanical solution" to the admission of evidence under 404(b). Advisory Committee's Notes on Fed. Rule Evid. 404(b), 28 U.S.C. App., p. 691.

*Huddleston*, 485 U.S. at 687-88 (emphasis added). Instead, the Committee intended the district court to assess the evidence "under the usual rules for admissibility" by examining whether the risk of undue prejudice outweighed the probative value of the evidence. *Huddleston*, 485 U.S. at 688. As a further cautionary measure, the Supreme Court affords lower courts the option of preliminarily allowing the introduction of such evidence to the jury, and later deciding whether  a cautionary instruction is required.

> Often the trial court may decide to allow the proponent to introduce evidence concerning a similar act, and at a later point in the trial assess whether sufficient evidence has been offered to permit the jury to make the requisite finding.  If the proponent has failed to meet the minimal standard of proof, the trial court must instruct the jury to disregard the evidence.

*Huddleston*, 485 U.S. at 690.

Holding that  tendered Rule 404(b) evidence must  simply cross  the traditionally established thresholds, the Court concluded that:

19

> We think . . . that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402 as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Huddleston*, 485 U.S. at 691-92 (internal citations omitted).

The Government respectfully submits that the assessment in the instant case can be performed during the trial and outside the presence of the jury, if needed. Although the defendant has no more of a right to review the Government's 404(b) evidence prior to trial than he does to review any other evidence the Government intends to introduce, the Government has provided to the defendant discovery as to the potential 404(b) evidence. As long as the Government provides notice of the general nature of the evidence it intends to introduce under Rule 404(b), the usual rules of admissibility apply.

### c. Evidence of Noe Juarez's prior conspiracies with the Mickey Gallegos drug trafficking organization and the Rudy Castaneda drug trafficking organization are admissible pursuant to Federal Rule of Evidence 404(b)

Under *Beechum*, evidence of the nature of Juarez's prior acts is admissible. At trial, one of the anticipated defenses that Juarez will offer is that he did not have the intent to commit the instant crime of conspiring to distribute drugs and weapons with and to drug trafficking organizations – his not guilty plea, standing alone, is a claim of no intent. Evidence of Juarez's similar interactions (providing confidential police database information and tactical tips, providing vehicles, and selling guns) with two other drug trafficking organizations (the Gallegos

and Castaneda conspiracies) are therefore relevant to issues that the the defendant has already put in issue with his statement to law enforcement . Juarez may also claim this this whole case was a "mistake" or "accident" on his part – that he did not know that the Grimaldos and Duarte were engaged in drug trafficking – but his involvement with major drug dealers like Gallegos, or his sale of guns to the Castaneda conspiracy (all recorded by the confidential informant with numerous references to the weapons being needed for the people she worked for in Mexico) – would be critical information  the jury would need to get the full picture of Juarez's knowledge and involvement. Should Juarez seek to argue that he did not have the opportunity to do this, his provision of information from police databases on prior occasions to these other conspiracies would be vital evidence the jury would need to come to a determination in this case.

To satisfy the second prong of *Beechum*, the Court must determine that the probative value of the evidence outweighs any prejudice it may have. The 404(b) evidence to be offered includes the underlying facts of Juarez's involvement with two other drug conspiracies. All prosecutorial evidence is prejudicial to some degree, but the offered evidence has no more additionally prejudicial impact than any of the other evidence to be offered by the Government. The powerfully probative impact of evidence which helps to settle the issue of Juarez's intent, absence of mistake, and plan cannot be overlooked.

As emphasized above, Rule 404(b) stresses that admission of relevant evidence and "exclusion of extrinsic evidence based on its prejudicial effect should occur only sparingly." *Leahy*, 82 F.3d at 637. The prejudicial impact of extrinsic evidence is heightened when it is "of a heinous nature" or would "incite the jury to irrational decision by its force on human emotion." *Beechum*, 582 F.2d at 917. Here, the extrinsic offense which occurred with the other conspiracies, but which is inherently similar to the charged events, is not heinous, nor would it

encourage the jury to base its decision on emotion instead of the facts. This Court can minimize any prejudicial effect by giving a limiting instruction to the jury. As such, the second prong of the *Beechum* test is satisfied. Thus, the Government should be permitted to present the jury with evidence regarding the underlying facts behind the defendant's prior acts.

## III.        CONCLUSION

For the reasons stated, the Government respectfully submits that the evidence of the underlying facts of Noe Juarez's prior acts should be admitted to provide the jury with the full context of the events in the instant case.

Respectfully submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

s/John F. Murphy
JOHN F. MURPHY
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana   70130
Telephone:  (504) 680-3126

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

/s/John F. Murphy
JOHN F. MURPHY
Assistant United States Attorney